IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JUANITA LARACUENTE,           :        CIVIL ACTION
o/b/o E, a minor,             :
        Plaintiff             :
                              :
     VS.                      :
                              :
JO ANNE B. BARNHART,          :
Commissioner of               :
Social Security,              :
        Defendant             :        NO. 04-2278

_____

**REPORT AND RECOMMENDATION**

**LINDA K. CARACAPPA**
**UNITED STATES MAGISTRATE JUDGE**

Juanita Laracuente, mother of "E"[1], brought this action on his behalf under 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's claim for supplemental security income (SSI) (children's benefits) under Title XVI of the Social Security Act (Act).  The parties have filed cross-motions for summary judgment.  For the reasons which follow, it is recommended that summary judgment be granted in favor of the Commissioner.

**BACKGROUND AND PROCEDURAL HISTORY**

E is a fifteen-year-old male born on May 24, 1990 (Tr. 67).

_____

[1]In this Report and Recommendation, we will refer to Ms. Laracuente as the "plaintiff" and her son as "E" as he is identified in the caption.

1

Plaintiff applied for SSI on his behalf on October 8, 1998. This application was denied upon initial review and plaintiff did not seek further review (Tr. 49-52). She again applied for SSI on October 25, 1999 alleging disability as of May 24, 1992 due to attention deficit hyperactivity disorder (ADHD), a learning disability, and a speech and language deficit (Tr. 53).

Plaintiff's application was denied initially and a hearing before an administrative law judge (ALJ) was requested.[2] A hearing was held on March 22, 2001, at which, E, represented by counsel, testified with the aid of an interpreter along with his mother (Tr. 28-46). In a decision rendered April 26, 2001, the ALJ determined that E has "attention deficit/hyperactivity disorder and a learning disability, which are severe impairments." The ALJ, however, further determined that E's impairments do not equal or functionally equal any of the listed impairments in Appendix 1, Subpart P, Regulations No. 4 (20 C.F.R. § 416.924(d)). Thus, he was found to be not eligible for benefits (Tr. 12-21).

The ALJ's findings became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on July 13, 2001 (Tr. 3-5). Plaintiff then appealed to this court. On September 19, 2002, the District Court ruled that

---

[2]This matter was randomly selected by the Social Security Administration to test modifications to the disability determination process. See 20 C.F.R. § 416.1406 (b)(4)(2000). Accordingly, there was no reconsideration level of review.

the ALJ's decision should be vacated and remanded to the ALJ for consideration of additional issues.  Another hearing was held on February 26, 2003, at which, E, represented at an attorney, testified along with his mother with the aid of a Spanish interpreter.

In a decision dated March 24, 2003, the ALJ determined that E has a "medically determinable learning disorder, an attention deficit hyperactivity disorder, an adjustment disorder with mixed emotional features, a borderline intellectual functioning disorder, and a speech and language deficit disorder" which are severe impairments.  The ALJ, however, again determined that such did not meet or equal a listed impairment, and E was found to be not entitled to benefits.  Plaintiff appealed to the Appeals Council who denied jurisdiction on April 7, 2004.  Presently, plaintiff has appealed that decision to this court.

## JUDICIAL REVIEW

The role of this court, on judicial review, is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Newhouse v. Heckler, 753 F.2d 283, 285 (3d Cir. 1985).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that the plaintiff is not disabled.

Substantial evidence is relevant evidence viewed objectively as adequate to support a decision. Richardson v. Perales, supra at 401; Kangas v. Bowen, 823 F.2d 775 (3d Cir. 1987); Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979).

The provision of the Social Security Act concerning children's benefits, as amended in August 1996, provides:

> "An individual under the age of eighteen shall be considered disabled for the purposes of this subchapter if that individual has a medically determined physical or mental impairment which results in marked or severe functional limitations, and which can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 1382c(a)(3)(C)(I).

To determine whether a child is eligible for SSI, a three-step sequential evaluation is followed. The Commissioner considers, in sequence, whether the child: (1) is engaging in substantial gainful activity; (2) has a medically determinable impairment or combination of impairments that is severe; and, if so, (3) whether the child's impairment(s) meets, medically equals, or functionally equals in severity any of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. 20 C.F.R. § 416.924(d).

In this case, the Commissioner followed the three-step sequential evaluation process and found that E's impairment did not medically equal, meet, or functionally equal in severity the criteria for a listed impairment.

4

**MEDICAL HISTORY**

The relevant evidence in this case consists of medical reports and testimony which are summarized as follows:

E had a psychiatric evaluation at the Wedge Medical Center on February 15, 1998 at the age of seven.  His intelligence was found to be subnormal, mood anxious, insight poor, behavior agitated, thought content unremarkable, perception normal, and memory poor.  His diagnosis was given as ADHD[3] with mixed emotion features (Tr. 209-210).

E was given a mental status exam at the Albert Einstein Healthcare Network on October 20, 1998.  His behavior was described as being easily distracted, impulsive, and restless.  His mood was neutral, cognitive memory impaired and below average, and his judgment impaired (Tr. 230-231, 236).

The record contains several visit notes from the Ambulatory Pediatric Clinic.  On October 20, 1998, it was reported that E's mother indicated that he was threatening to kill himself and was setting things on fire.  When evaluated, E denied wanting to hurt himself or setting fires.  He did state that he has auditory

---

[3]Attention-Deficit/Hyperactivity Disorder- a childhood mental disorder characterized by inattention (such as distractibility), forgetfulness, not finishing tasks, and not appearing to listen), by hyperactivity and impulsivity (such as fidgeting and squirming, difficulty in remaining seated, excessive running or climbing, feelings of restlessness, difficulty awaiting one's turn, interrupting others, and excessive talking) or by both types of behavior." Dorland's Illustrated Medical Dictionary, Twenty-ninth Edition, 2000, p. 528.

hallucinations where he hears a man's voice telling him to kill cats, but he has not acted on it (Tr. 199-201).

On February 24, 1999, E, age 8 years, nine months, was given a clinical and intellectual evaluation by Dr. Stephen Rosenfield at the request of the Pennsylvania Bureau of Disability Determination. E's mother informed him that E takes Ritalin three times a day for ADHD, but she had been too busy to give it to him prior to coming to the evaluation. Dr. Rosenfield described E's general activity to be somewhat excessive and his attention span distractable. His degree of cooperation was "fairly reasonable." His mood "seemed somewhat tense and nervous as well as perhaps depressed." He also exhibited a "full range of affect from depression to elevated anxiety." In the Leiter International Performance Scale, E earned a mental age of 6 years and 3 months in comparison to his chronological age of 8 years, 9 months. He had an IQ of 76 which placed him at the borderline range of intellectual functioning. Dr. Rosenfield added that E's "overall concentration, persistence and pace appear to be rather distractable especially when not using his current medication regimen." Diagnoses were given as Attention Deficit Hyperactivity Disorder, adjustment disorder with mixed emotional features, and borderline intellectual functioning (Tr. 240-243).

Dr. J.J. Kowalski filled out a Childhood Disability Evaluation form on March 16, 1999. He indicated that E has ADHD, an

adjustment disorder, and borderline intellectual functioning that do not meet or equal the severity of a listed impairment.  He opined that E has "no evidence of a limitation" in the areas of motor, social, and personal functioning, to have "less than marked" limitation in cognitive/communicative functioning and concentration, persistence and pace (Tr. 244-247).

Plaintiff was given a psychological evaluation on January 26, 1999 by a bilingual psychologist, Jaime Loyola, Ph.D., for the School District of Philadelphia.  Dr. Loyola found E's overall cognitive functioning to be "within the lower part of the average range.  Visual-motor coordination skills were within expected level.  In the math area, Elias was able to do simple addition and subtraction with single digits.  On the other hand, he displayed a total lack of knowledge with addition and subtraction with two digit numerals."  In the reading area, he was able to identify letters by name or sound.  "His rate of retention and acquisition indicate that he is making progress in the reading area.  Dr. Loyola recommended that E be considered a "non-exceptional student," be taught at his instructional level, increase his reading fluency by practicing at home, and be considered for tutoring (Tr. 269-271).

On January 11 and 21, 2000, E was given a psychological evaluation by Karen Dybner-Madero, Psy.D., of the Children's Crisis Treatment Center.  Dr. Dybner-Madero noted that E had a history of

hearing voices, but not presently, and was no longer taking Ritalin. He was presently doing poorly in school. His skills are not as developed as they should be and he is unable to complete his work. His language abilities seem to be hindering his progress in this area. Dr. Dybner-Madero added that E "struggled to work in a concentrated manner, though he was able to complete most tasks as required. While Elias seemed compliant in regard to directions, there was a pervading sense of boredom and sadness in him and restricted affect." E also told Dr. Dybner-Madero that auditory and visual hallucinations were no longer a problem (Tr. 273-274).

Intelligence tests were administered by Dr. Dybner-Madero and E received a test composite score of 74 which indicated borderline intelligence. His verbal reasoning was 69(borderline), abstract/visual reasoning 94 (average), quantitative reasoning 86 (low average), and short-term memory 64 (deficient) (Tr. 276).

Dr. Dybner-Madero summarized that scores fluctuated from the mentally deficient to the average range and there was a significant discrepancy between his verbal and non-verbal abilities, "but this seems due more to the fact that the verbal section relies on strong English language and American cultural base. Therefore, it is likely that Elias's verbal abilities are actually stronger, given that his verbal skills are not thought to be as poor as they appear from this measure. On a measure of academic achievement, he demonstrated significant weakness in the areas of spelling, reading

8

and arithmetic.  While Elias may have a weakness with short-term abilities, which appears to hinder his overall ability to take in and process new information, he does not seem to be learning at the expected rate for his estimated intellectual ability" (Tr. 279).

Dr. Dybner-Madero continued that E's emotional functioning appeared quite poor.  "He is viewed as a sensitive boy who is having significant trouble managing his feelings and impulses.  He is quite insecure about himself and has trouble expressing his feelings, not to mention his thought and ideas.  This leads him to often act out his feelings . . .  He appears to meet the criteria for ADHD, though his parents view symptoms consisting in difficulties with hyperactivity, while his teacher views his trouble as more to do with inattention."  Dr. Dybner-Madero then recommended that E receive special education classes, neurological testing to better understand the nature of his short-term memory deficits, and individual therapy to help him explore his underlying sadness (Tr. 279-280).

On February 12, 2000, E was given a psychological disability evaluation by Daniel Schwarz, Ph.D., at the request of the Pennsylvania Bureau of Disability Determination.  Dr. Schwarz noted that E's mother reported that he was no longer taking Ritalin as he did not benefit from it and continued to see a therapist twice a month at the Wedge Community Center.  Plaintiff was currently attending regular classes earning D's and F's in all subjects.  His

general activity level is seen as hyperactive and restless, and his attention span poor with a high level of distract ability and difficulty remaining on task.  Dr. Schwarz found E to have some low self esteem, but no other significant mood or affect problems.  He does not have "any clear perceptual disturbances.  Personality functioning is seen to be a nine-year old, sweet, Puerto Rican male, who manifests only slightly regressed behavior."  He added that [C]learly there are acculturation issues for this claimant and his family.  He has a need to improve his English skills and needs parental support in order for this to happen.

Dr. Schwarz concluded that E's prognosis was "fair as long as the claimant continues to attend his outpatient psychiatric and psychological therapies."  He also recommended that E's parents pursue the IEP recommendations at school and learn English themselves to create a positive role model for him to learn the language (Tr. 281-283).

Martha Jimenez, a teacher at E's school, the Potter Thomas Bilingual School, completed a Teacher/Counselor Questionnaire on December 1, 2002.  She indicated that she had known E for four years.  She was previously his reading teacher and currently was his 5th grade everyday teacher.  She stated that E receives special education in math, speech therapy, and counseling.  He has a short temper and talks too much, but cooperates with the teacher and others, and "when he is in a good mood he's very attentive."  He

10

cannot easily remember a concept the first time and things must be explained to him again. "He works at the class pace, except for some occasions when he complains frustrated because he doesn't understand. But mostly he keeps up with the rest of the class pace. He does complete assignments. He receives special reading and math help, but works with the rest of the class in the other subjects. In response to the question of whether E has become disruptive in class or started to fail tests, Ms. Jimenez circled "no," and wrote that once or twice his temper acts up, but after talking to his mother this stops. She wrote further that [H]is behavior is an average behavior for his age (Tr. 333-337).

In addition, Ms. Jimenez completed a Child Functioning Questionnaire on January 28, 2003. She checked off that E "often" has difficulties learning new material, remembering instructions, and using appropriate vocabulary, "always" has difficulties demonstrating problem-solving skills, and "sometimes" has difficulties recalling previously learned material, demonstrating short-term recall, understanding verbal instructions, following verbal instructions, comprehending written instructions, following instructions, counting or spelling, and learning in comparison to same-age unimpaired children. She explained that E "need[s] individual help most of the time, but he is very motivated to learn. He receives help in reading and math by specialist teachers" (Tr. 353).

In the area of interacting and relating, Ms. Jimenez indicated that plaintiff gets along with other children and authority figures.  He shares and takes turns, never displays unprovoked hostility, and is never aggressive.  She summarized that E "gets along with his peers.  He has a good approach to them.  He was aggressive on a rare occasion because he felt he was treated unfair.  This behavior does not occur often.  He does his glasswork and home work" (Tr. 354).

Regarding attending and completing tasks, Ms. Jimenez checked off that E "often" is easily distracted and needs "supervision all the time."  He only has difficulties "sometimes" waiting to take turns, blurting out answers, following through on instructions, carrying out simple instructions, becoming frustrated, keeping pace with other children, completing tasks on time, and being without supervision for short periods.  She wrote that his "attention span is short unless he is well motivated.  Most of the time he finishes the tasks without teacher intervention.  But when it comes to spelling, [and] math, he needs coaching and supervision (Tr. 355).  She also stated that E acts "like a normal boy.  He plays and follows instructions very well.  Outdoor recess, he gets along with peers.  Participating in group activities interacting very good.  His problem is in comprehension, retention skills at school."  He also has no difficulties with motor skills and coordination (Tr. 356-357).  Ms. Jimenez further noted that E was not using any

medications (Tr. 358).

At the first administrative hearing before the ALJ, E's mother testified that he lived in a house with his parents and three siblings (Tr. 35). E was able to express himself to her, his teachers, and his friends (Tr. 38). His daily activities included attending school, doing his homework, playing basketball on a team, and serving as an altar boy at church (Tr. 39-40). E testified that he liked his teachers, has friends in school, and gets along with his siblings (Tr. 43). He testified that, after school, he did his homework and then went outside to play basketball (Tr. 43). He rides a bike and watches television (Tr. 43-44).


## DISCUSSION

The Commissioner's findings must be affirmed if they are supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). The role of this court is to determine whether there is substantial evidence to support the Commissioner's decision. Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924, 113 S. Ct. 1294 (1993).

In coming to a decision, it is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence. Richardson v. Perales, supra; 659 F.3d 1071 (3d Cir. 1981).

In this case, the ALJ found that E has a "medically determinable learning disorder, an attention deficit hyperactivity disorder, and adjustment disorder with mixed emotional features, a borderline intellectual functioning disorder, and a speech and language disorder, impairments which are severe," but are not of a severity to meet or equal a listed impairment.  E was, thus, determined to be not disabled under the Act (Tr. 327).  For the reasons which follow, this court finds that the ALJ's decision is supported by substantial evidence and summary judgment should be granted in favor of the Commissioner.

As mentioned in the procedural history above, this action was previously before this court on appeal from a final decision of the Commissioner on July 13, 2001.  In a Report and Recommendation dated August 26, 2002, we recommended that the matter be remanded back to the Commissioner.  Specifically, we found that the ALJ failed to properly consider whether E suffered with an emotional or mental impairment since the record contained some evidence indicating that he may suffer with such a condition.

We further determined that the ALJ failed to consider evidence concerning a speech impairment.  We concluded that "it was incumbent upon the ALJ to explicitly consider the evidence suggesting a possible mental or emotional impairment; and that substantial evidence does not support the ALJ's determination that Martinez does not have a medically determinable speech impairment."

14

We directed that [U]pon remand the ALJ should consider the above evidence and determine whether Martinez's impairments, either alone or in combination, meet a listing, medically equal a listing, or a functionally equivalent to a listing.  Should the ALJ decide to discount or reject this evidence, he must provide a sufficient explanation with valid reason for rejection."  <u>See</u> <u>Juanita Laracuente o/b/o Elias Martinez</u>, C.A. 01-4675, Report and Recommendation, filed August 26, 2002 at 14-15.  The Honorable Edmund V. Ludwig, subsequently, adopted this Report and Recommendation and it was remanded back to the Commissioner.

In her present summary judgment motion, plaintiff claims that the ALJ erred in failing to find that E's impairments are "functionally equivalent" to a listed impairment.  Under the regulations, this is measured under six domains.[4]  To be "functionally equivalent," E would have to have "marked"[5]

---

[4]The six domains are: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for yourself; and 6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(2004).

[5]"Marked"-- "We will find that you have a 'marked' limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities.  Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities.  'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but not less than three, standard deviations below the mean.  20 C.F.R. §

limitations in at least two of these domains, or "extreme" limitations in one domain[6].

Here, the ALJ concluded that E does not have an "extreme" functional limitation in any domain, has a "marked" limitation in the domain of "acquiring and using information," has "less than marked" functional limitations in the domains of "attending and completing tasks" and "interacting and relating with others," and has no functional limitations in the domains of "moving about and manipulating objects," "caring for one's self," and "health and physical well-being." Accordingly, since he determined that E did not have an "extreme" limitation in at least one domain or a "marked" limitation in at least two domains, the ALJ concluded that E's impairments are not functionally equivalent in severity to the listings.

Plaintiff asserts that the ALJ failed to consider the "cumulative and interactive effect" of all of E's impairments as required under 20 C.F.R. § 416.926a(c).

This section provides:

> "When we evaluate your functioning and decide which domains may be affected by your impairment(s), we will first look at your activities and your limitations and restrictions. Any given activity may involve the integrated use of many abilities and skills; therefore, any single limitation may be the result of the interactive and cumulative effects of one or more impairments. Any given impairment may have effects in

---

416.926a(e)(2)(i).

[6]See 20 C.F.R. § 416.926a (e)(2)(i)(2004).

more than one domain; therefore, we will evaluate the limitations from your impairment(s) in any affected domain(s)."

Specifically, plaintiff asserts that had the ALJ properly considered the cumulative and interactive effects of all of E's impairments, the ALJ should have found that his impairments interfere seriously with his functioning when compared with same-age, unimpaired children in several other domains, namely Attending and Completing Tasks and Caring for Yourself.

We will first address the domain of Attending and Completing Tasks. In his decision, the ALJ recognized that in determining the severity of E's limitations in this domain, "consideration is given as to how well the claimant is able to focus and maintain attention, and how well the claimant begins, carries through, and finishes activities, including the pace at which the claimant performs the activities, and the ease with which they are changed" (Tr. 324). See 20 C.F.R. § 416.926a(h).

He then determined that E demonstrates more than minimal functional limitations in that he "displays poor memory and limited focus of attention, and exhibits difficulty in sustaining attention, concentration, mental control, and working memory, indicative of a highly impulsive and poorly regulated response style" (Tr. 324-325). The ALJ, however, concluded that E "displays no more than a moderate degree of symptoms or difficulty, as indicated by GAF scores of 55; that the claimant's symptomatology

has improved when the claimant has been compliant with recommended treatment regimens; and that the claimant has been described as 'working at the class pace, except for some occasions', and 'regularly' completing class assignments" (Tr. 325).

A review of the record indicates that E certainly has had focus and attention problems in his young life. However, the evidence does not establish that they are of a "marked" or "extreme" severity. E was diagnosed in February 1998 at age 7 at the Wedge Medical Center as having ADHD (Tr. 209-210). In October 1998, a mental exam at the Albert Einstein Healthcare Network described his behavior as being easily distracted, impulsive, and restless (Tr. 230-231). At age 8 years, nine months, in February 1999, Dr. Stephen Rosenfield stated that E's "overall concentration, persistence and pace appear to be rather distractable especially when not using his current medication regimen." He diagnosed him with ADHD (Tr. 240-243). A year later in January 2000, Dr. Karen Dybner-Madero gave E a psychological evaluation and commented that he "struggled to work in a concentrated manner, though he was able to complete most tasks as required (Tr. 273-274).

The reports from E's teachers in 2002 and 2003, however, indicate that while he has had some attention and focus problems in school, they do not cause him to have "marked" limitations in this

domain.[7]   In December 2002, Martha Jimenez, a teacher at E's
school, completed a teacher/counselor questionnaire.  She noted
that she had been E's reading teacher and was presently his
everyday 5th grade teacher.  She stated that "[H]e works at class
pace, except for some occasions when he complains frustrated
because he doesn't understand.  But mostly he keeps up with the
rest of the class pace.  He does complete assignments.  He receives
special reading and math help, but works with the rest of the class
in the other subjects" (Tr. 333-337).

Ms. Jimenez also completed a Child Functioning Questionnaire
in January 2003.  On the area of the form concerning attending and
completing tasks, she checked off that E is "often" easily
distracted, but he only "sometimes" has difficulties following
through on instructions, carrying out simple instructions, becoming
frustrated, keeping pace with other children, completing tasks on
time, and being without supervision for short periods.  She
commented that "[M]ost of the time he finishes tasks without

---

[7]20 C.F.R. § 416.926a(e)(1)(i) states in part:
       "When we decide whether you have a 'marked' or an
       'extreme' limitation, we will consider your functional
       limitations resulting from all your impairments, including
       their interactive and cumulative effects.  We will consider
       all the relevant information in your case record that helps
       us determine your functioning, including your signs,
       symptoms, and laboratory findings, the descriptions we have
       about your functioning from your parents teachers, and other
       people who know you. . ."

19

teacher intervention" (Tr. 355).

Plaintiff next asserts that E has marked limitations in the domain of caring for yourself.  In this domain, the ALJ is required to consider how well the child maintains a healthy emotional and physical state, including how well he/she gets physical and emotional wants and needs, how a child copes with stress and changes in his/her environment, and whether he/she takes care of his/her own health, possessions, and living area.  20 C.F.R. § 416.926a(k)(1).

In his decision, the ALJ stated that plaintiff did not "allege the existence of any significant limitations in this area of functioning, nor have any medical or educational sources indicated or suggested the existence of any such limitations" (Tr. 325-326). Plaintiff, however, argues in her summary judgment motion that the ALJ's finding of no limitations in this domain is contrary to other findings that he made in his decision, and are contrary to some other evidence in the record.  Plaintiff notes that in the ALJ's evaluation of the evidence, he wrote that E "displays episodic anger, temper tantrums," exhibits "a highly impulsive and poorly regulated response style," and manifests "demanding, manipulative, destructive, negative and/or provocative behavioral patterns" (Tr. 325-326).  Plaintiff also asserts that E was referred to the emergency psychiatric unit in October 1998 after threatening suicide at age 8 (Tr. 225-239).

20

However, like the previous discussed domain, while the record contains some evidence of problems in this domain in E's younger years, the evidence does not establish that such caused E limitations at the time of the ALJ's decision, and the evidence clearly does not establish limitations that are of a marked or extreme severity.

In a January 2000 psychological evaluation, Dr. Dybner-Madero stated that E's emotional functioning appeared quite poor.  He was having "significant trouble managing his feelings and impulses.  He is quite insecure about himself and has trouble expressing his feelings, not to mention his thoughts and ideas.  This leads him to often act out his feelings" (Tr. 279-280).  However, in February 2000, Dr. Daniel Schwarz gave E a psychological disability evaluation and found him to have some low self esteem, but no other significant mood or affect problems.  He further found E to have no clear perceptual disturbances and described him as a "nine years old, sweet, Puerto Rican male, who manifest only slightly regressed behavior" (Tr. 281-283).

In addition, Ms. Jimenez wrote in her December 2002 Teacher/Counselor Questionnaire that E's "behavior is an average behavior for his age" (Tr. 336).  Moreover, in the Child Functioning Questionnaire that she completed in January 2003, Ms. Jimenez wrote that E gets along with other children and authority figures.  He shares, takes turns, and never displays unprovoked

hostility.  She added that E "gets along with his peers.  He has a good approach to them.  He was aggressive on one occasion because he felt he was treated unfair" (Tr. 354).  She also opined  that plaintiff acts "like a normal boy.  He plays and follows instructions very well.  Outdoor recess, he gets along well with peers.  Participating in group activities interacting very good" (Tr. 358).

Regarding the other domains of interacting and relating to others, moving about and manipulating objects, and health and physical well-being, the evidence supports the ALJ's decision that E has either minimal limitations or no limitation of functioning.  Moreover, plaintiff does not challenge these findings in her summary judgment motion.

Likewise, plaintiff does not challenge in her motion that the ALJ failed on remand to do what he was instructed to do in our previous Report and Recommendation.  As noted earlier, in such, we found that the ALJ failed to properly consider whether E suffered with a mental impairment and that he failed to consider evidence of a speech impairment.  Upon remand, the ALJ was required to consider such in addition to whether E's impairments meet, equal, or are functionally equivalent to a listing.

Although plaintiff does not argue that the ALJ failed to consider evidence of a speech impairment and an emotional impairment upon remand, we will briefly address these issues.  A

22

review of the ALJ's decision indicates that he properly considered both upon remand. He specifically, considered listings for Organic Mental Disorders (§112.02), Affective Disorders (§112.04), Mental Retardation Disorder (§112.05), Autistic/Development Disorders (§112.10), and Attention Deficit Hyperactivity Disorder (§112.11). He found that although E has some symptoms of these listings, the evidence does not establish a severity to meet one or more of these listings.

The ALJ also considered evidence of a speech impairment. He specifically considered whether E had a speech impairment which met or equaled listing 2.09. He went on to list a number of reasons why the evidence did not establish that E has a speech impairment that meets the listing. He correctly noted that plaintiff testified at the first administrative hearing that E is able to express himself to her, his teachers, and his friends. His teachers have reported no significant difficulties with a speech problem, and that part of E's speech problem with the English language was the fact that he was an immigrant from Puerto Rico (Tr. 319-320). Accordingly, the ALJ considered all issues on remand that were required.

In conclusion, the ALJ considered and analyzed all the relevant medical evidence, and indicated both the evidence relied upon and his rationale in making his determination. Cotter v. Harris, 650 F.2d 481 (3d Cir. 1981). Accordingly, the

Commissioner's motion for summary judgment should be granted.

Therefore, the court makes the following:

## **RECOMMENDATION**

**AND NOW**, this                day of                         , 2005,

**IT IS RESPECTFULLY RECOMMENDED** that Plaintiff's Motion for Summary

Judgment be **DENIED** and the Commissioner's Motion for Summary

Judgment be **GRANTED.**

_____
**LINDA K. CARACAPPA**
**UNITED STATES MAGISTRATE JUDGE**